OPINION OF THE COURT
GARTH, Circuit Judge:
In this appeal, we must decide whether the parties had agreed to arbitrate a labor dispute, thereby rendering it arbitrable under the parties’ collective bargaining agreement. The District Court concluded that they had not, and we will affirm.
I.
Rite Aid of Pennsylvania, Inc. (“Rite Aid”) operates a chain of drugstores in Pennsylvania. United Food and Commercial Workers, Local 1776 (“the Union”) represents nonmanagerial employees in Rite Aid’s eastern Pennsylvania stores. Rite Aid and the Union are parties to three separate collective bargaining agreements (CBAs) covering Rite Aid stores in twenty-four Pennsylvania counties.[1]
In 2007, Rite Aid acquired a chain of drugstores formerly operated by Brooks Eckerd. The employees of the newly-acquired stores were not yet represented by the Union. When Union representatives attempted to enter six of the new stores in September 2007, Rite Aid denied them entry.
On November 7, 2007, the Union filed three identical grievances (one under each CBA), asserting that the CBAs conferred upon the Union a right to access newly-acquired or newly-opened stores within each CBA’s geographic jurisdiction. Rite Aid denied the grievances, citing a policy against solicitation. The Union referred the three grievances to arbitration, where they were consolidated into a single proceeding, and a hearing date was set.
Prior to the arbitration hearing, Rite Aid filed an action in the United States District Court for the Middle District of Pennsylvania, seeking a declaratory judgment of the grievances’ non-arbitrability. On July 1, 2008, the parties filed cross-motions for summary judgment.
Rite Aid argued that the grievances were not arbitrable in light of Section 11.4 of the CBA, which provides: “No grievance shall be filed by the associate or the Union, nor need the Employer entertain any grievance that does not involve the interpretation of any provision of this Agreement.” (emphasis added). The Union responded by citing three CBA provisions under which it purported to assert its store-access grievances. The Union argued that because its grievances arose under at least one of those provisions, arbitration was required, regardless of the grievances’ merits.
On March 31, 2009, the District Court granted Rite Aid’s motion and denied the Union’s motion. The court found that the grievances did not involve the interpretation of any CBA provisions, and that they therefore fell outside the scope of the *131 CBA’s arbitration clause. The Union filed a timely notice of appeal.[2] We have jurisdiction pursuant to 28 U.S.C. § 1291.
II.
The District Court’s decision regarding the applicability and scope of the parties’ arbitration agreement is subject to our plenary review. United Steelworkers of Am. v. Rohm and Haas Co., 522 F.3d 324, 330 (3d Cir.2008); Harris v. Green Tree Financial Corp., 183 F.3d 173, 176 (3d Cir.1999).[3] In reviewing a District Court ruling on a motion for summary judgment, we apply the same test District Courts are to apply under Fed. Rule. Civ. P. 56(c). Brown v. J. Kaz, Inc., 581 F.3d 175, 179 (3d Cir.2009). Summary judgment is appropriate if and only if, after the evidence taken as a whole is construed in the light most favorable to the non-moving party, there remains no genuine issue of material fact. Prowel v. Wise Business Forms, Inc., 579 F.3d 285, 286 (3d Cir.2009).
The venerable legal principles guiding the construction and enforcement of arbitration clauses in collective bargaining agreements are well established. We have often recognized the strong federal policy in favor of resolving labor disputes through arbitration. See, e.g., United Parcel Service, Inc. v. Int’l Brotherhood of Teamsters, Local Union No. 430, 55 F.3d 138, 141 (3d Cir.1995); Laborers’ Int’l Union of N. Am. v. Foster Wheeler Corp., 26 F.3d 375, 399 (3d Cir.1994); Exxon Shipping Co. v. Exxon Seamen’s Union, 11 F.3d 1189, 1196 (3d Cir.1993). More specifically, the inclusion of a broad arbitration clause in a collective bargaining agreement gives rise to a presumption of arbitrability which may be rebutted only by “the most forceful evidence of a purpose to exclude the claim from arbitration.” AT & T Techs., Inc. v. Comm’s Workers of Am., 475 U.S. 643, 650, 106 S.Ct. 1415, 89 L.Ed.2d 648 (1986) (quoting United Steelworkers of Am. v. Warrior & Gulf Nav. Co., 363 U.S. 574, 585, 80 S.Ct. 1347, 4 L.Ed.2d 1409 (I960)). The parties agree that the arbitration provisions in the CBA at issue are broad, and that the presumption of arbitrability therefore applies in this case.
Notwithstanding that presumption, “arbitration is still a creature of contract and a court cannot call for arbitration of matters outside of the scope of the arbitration clause.” Rohm and Haas Co., 522 F.3d at 332. Unless the parties clearly provide otherwise, the courts, not the arbitrators, are tasked with interpreting agreements in order to determine whether the parties have indeed agreed to arbitrate disputes whose arbitrability is contested. See AT & T Techs., 475 U.S. at 649, 651, 106 S.Ct. 1415; Local 827 v. Verizon New Jersey, Inc., 458 F.3d 305, 309 (3d Cir.2006). In making that determination, a court is not to examine the potential merits of the claim sought to be arbitrated, except as we point out in Part IV, where the claim’s merits and its arbitrability are inextricably intertwined. See Lukens, 989 F.2d at 672. Rather, the court is limited to the construction of the arbitration *132 clause and any contractual provisions relevant to its scope, as well as any other “forceful evidence” suggesting that the parties intended to exclude the disputes at issue from arbitration. See E.M. Diagnostic Sys., Inc. v. Local 169, 812 F.2d 91, 95 (3d Cir.1987).
Where an arbitration clause in a collective bargaining agreement limits arbitration to those disputes which require interpretation of the agreement, as it does here, a grievance is excluded from arbitration unless it arises from a specific provision in the agreement. See Rohm and Haas, 522 F.3d at 332 (“Although we hold that the Bristol CBA’s arbitration clause is broad, the underlying basis for the grievance submitted through the Bristol CBA grievance procedure must still arise from some specific article of the Bristol CBA.”). We may not accept an arbitration proponent’s citation to a particular provision of the CBA and its claim that the grievance arises thereunder without critical examination. Unquestioning acceptance of the Union’s characterization of its claims is inconsistent with our duty to determine arbitrability because it “leaves the scope of the arbitration clause subject to the unilateral and unfettered discretion of the Union.” E.M. Diagnostic, 812 F.2d at 95. We must determine whether indeed “the subject matter of the grievance is one that is within the zone of interests that have received protection in the collective bargaining agreement” and one that the parties have agreed to arbitrate. Id.
Having outlined the controlling principles, we turn now to their application to the grievances and arbitration clause in the present case.
III.
Article 11 of the CBA creates a procedure under which the Union or one of its members may file grievances with Rite Aid. The CBA provides for review of the grievance by progressively higher levels of Rite Aid management and, if the dispute is not amicably resolved, ultimately for resolution of the dispute by an arbitrator.[4]
As noted supra, the scope of the arbitration provision in the CBA is broad but not unbounded. Section 11.4 of the CBA provides: “No grievance shall be filed by the associate or the Union, nor need the Employer entertain any grievance that does not involve the interpretation of any provision of this Agreement.” (emphasis added). Thus, the plain language of the CBA indicates that the parties have agreed to arbitrate only those disputes which genuinely implicate one or more provisions of the CBA. Our task is therefore to decide whether the Union’s store-access grievance falls within the scope of the arbitration clause by raising a legitimate question of the CBA’s interpretation.
The Union points to three provisions of the CBA, contending that each provides a basis for its claim that Union representatives are entitled to access Rite Aid’s newly-acquired stores and their employees. We examine each in turn.

A. Recognition Clause

Section 2.1 of the CBA reads:
*133 The Employer recognizes the Union as the sole and exclusive bargaining agent for the purpose of bargaining in the Bargaining Unit in respect to rates of pay, wages, hours of employment, and other conditions pertaining to employment. ...
The Union argues that its interpretation of this clause gives rise to its access grievance.
We are not persuaded by the argument the Union advances based on the decision of the National Labor Relations Board (NLRB) in Houston Div. of the Kroger Co., 219 N.L.R.B. 388 (1975). In Kroger the NLRB held that a recognition clause similar to the one at issue in this case waives an employer’s right to demand an election in a new or after-acquired store, but that the union is nevertheless required to demonstrate majority support among employees of those stores before it can be recognized. Id. at 389. However, the NLRB did not specify the means by which unions are to demonstrate majority support in this situation. The Union here argues that the CBA at least arguably grants it a right of store access, and it is therefore entitled to present that claim to an arbitrator.
This strikes us as a non sequitur. The NLRB’s failure to specify the means of establishing majority support in cases where the employer has waived its right to an election simply does not suggest that the Union must be allowed access to newly-acquired stores. The Union has not explained why any of the methods that might meet the NLRB’s approval would require its organizers to enter the store. If there is ambiguity in Kroger, it does not translate to ambiguity in the instant CBA.
The Union points to several arbitration decisions recognizing a right of access to newly-acquired stores, and contends that its present grievance must indeed involve interpretation of the recognition clause, since that interpretation has in fact been accepted by several arbitrators.[5]
Even were we to consider them, the merits decisions relied upon by the Union would not persuade us that the grievance is arbitrable. The Union calls our attention to a decision from the District of Oregon confirming an arbitration award under a CBA that included a provision specifically providing for the applicability of the CBA to new stores. The CBA in that case included the following provision: “The Employer agrees then if the Employer should establish a new retail food store or stores located in Clark County, Washington, and in the jurisdiction of Local 555, that as of the time such store is established this Agreement shall apply to all employees in job classifications set forth herein.” Albertson’s, Inc. v. Local 555, Civil No. 97-977-JO, slip op. at 4 (D.Or.1998) (emphasis added).
The CBA in the instant case contains no such provision.[6] To the extent that deci *134 sions of other arbitrators have found in favor of unions relying on the analysis of Kroger and the theory referred to above, we simply do not find them persuasive.
In our view, a right of Union access to newly acquired stores simply cannot be plausibly derived from the recognition clause. The recognition clause merely establishes the Union’s position as Rite Aid’s employees’ exclusive bargaining agent and defines the range of matters subject to bargaining. It does not describe or purport to include anything resembling the Union’s claimed right to access newly-acquired stores. The District Court correctly concluded that the recognition clause is not susceptible of an interpretation which would yield such a right.

B. Observation Clause

The Union next relies on Section 5.1 of the CBA, which provides in relevant part:
It is agreed that the Union duties and activities will not be carried on during work. This shall not prevent the Union officials from entering the Employer’s establishments to satisfy that this Agreement is being observed, provided that same shall not interfere with the normal operations or business of the store.
The Union argues that its grievance is arbitrable because it alleges that the Union’s exclusion from the newly-acquired Eckerd stores violated this provision of the CBA.
We question the Union’s reading of this provision, and its argument. The CBA cannot apply to the newly-acquired stores or to their employees because the Union does not presently represent those stores’ employees. (This is, of course, the very reason the Union seeks access to the stores.) We agree with the District Court that it is not possible for the Union to ensure compliance with the instant CBA at stores to which the CBA does not apply. Accordingly, the Union’s store-access grievance does not require interpretation of Section 5.1, the observation clause, and arbitration is not properly invoked by reliance on this provision.

C. Privileges Clause

Finally, the Union relies on Section 15.3, which provides:
Only privileges which have been granted by the present Employer since its acquisition of the establishments covered by this Agreement shall be continued.
The Union alleges that before the acquisition of the Brooks Eckerd stores, Rite Aid had permitted it to enter other new stores. Thus, according to the Union, the right of access is a privilege that “shall be continued” under the CBA — or, at the least, this interpretation is sufficiently plausible to conclude that the Union’s grievances indeed arise from an interpretation of the CBA.
A right of access cannot be considered one of the “privileges” referenced in Section 15.3 unless the clause’s context and *135 provisions are entirely ignored. Article 15 is titled “Miscellaneous Working Conditions,” and all of its provisions deal with the rights and responsibilities of employees covered by the CBA. The privileges to which the CBA refers are not privileges of the Union. For example, Section 15.4 establishes the rules under which worked time is recorded; Section 15.5 requires Rite Aid to furnish employees’ uniforms; Section 15.6 sets out the circumstances under which employees are to be held liable for cash shortfalls; Section 15.8 permits associates to transfer between the front end and pharmacy departments “in accordance with seniority and ability,” and so forth.
The Union argues that this contextual analysis intrudes into territory reserved for the arbitrator. However, our recent precedent confirms our ability to consider the context of a CBA provision in order to determine whether it is sufficiently implicated by a grievance that one party seeks to arbitrate.
In Rohm & Haas, supra, the parties contested the arbitrability of a denial of disability benefits. Management and the employee’s union had negotiated a Collective Bargaining Agreement containing an arbitration clause, but disability benefits were provided only under a separate ERISA plan lacking any arbitration provisions. The employee argued, inter alia, that his denial-of-benefits grievance arose under the Agreement because one provision of the agreement made reference to the ERISA benefits plan in describing the procedures to be followed in case of a disagreement over whether an employee should be considered physically incapable of working. 522 F.3d at 328-29.
We rejected this argument after examining the context, which revealed that the provision “contemplates a situation where an employee seeks to continue working in spite of a potential disability.” Id. at 334. Because the employee did not propose to continue working, we found that the Agreement did not apply to the employee’s grievance, and the denial-of-benefits claim was therefore not arbitrable. We concluded: ‘We do not find any ambiguity in the [CBA] that would permit it to be reasonably interpreted to provide for disability benefits or to provide for arbitrating a plan administrator’s denial of such benefits arising from a separate ERISA plan.”[7] Id.
Similarly here, the entire context of Section 15.3 makes clear that the “privileges” discussed in Article 15 pertain to Rite Aid’s employees’ working conditions. Article 15 has nothing to do with the Union’s right to organize or to be recognized in newly-acquired stores. The Union’s grievances as to store access simply do not involve an interpretation of Section 15.3, and thus do not come within the scope of the CBA’s arbitration clause.
In sum, Section 11.4 of the CBA, which provides that “[n]o grievance shall be filed *136 by the associate or the Union, nor need the Employer entertain any grievance that does not involve the interpretation of any provision of this Agreement,” constitutes “forceful evidence,” particularly in light of the context that we have analyzed, that the parties intended to exclude from arbitration claims which arise wholly outside the scope of the CBA. The Union’s store-access grievance does not fall within the scope of the CBA’s arbitration clause because it does not require the interpretation of any of the CBA’s provisions.[8]
IV.
The Union additionally argues that the District Court impermissibly considered the merits of its grievance in making its arbitrability determination. We cannot agree. Decisions of the Supreme Court and Courts of Appeals have made clear that where the merits and arbitrability questions are inextricably intertwined, a court’s arbitrability decision may, of necessity, touch incidentally on the merits.
In Litton Financial Printing Div. v. NLRB, 501 U.S. 190, 111 S.Ct. 2215, 115 L.Ed.2d 177 (1991), the union representing Litton’s employees sought to arbitrate a dispute over layoffs of ten workers, including Litton’s six most senior employees. Like the CBA in this case, the Agreement contained an arbitration provision whose scope was limited to disputes “regarding [the] Agreement and any alleged violations of the Agreement, [and] the construction to be placed on any clause or clauses of the Agreement.” Id. at 194, 111 S.Ct. 2215. The Litton CBA provided that, “in case of layoffs, lengths of continuous service will be the determining factor if other things such as aptitude and ability are equal.” Id. However, because the agreement had expired nearly a year before the layoffs occurred, Litton contested the grievance’s arbitrability. The union argued that the seniority provision created a vested right which survived the expiration of the agreement, and thus the layoffs constituted violations of the agreement notwithstanding that they had occurred after expiration.
The Supreme Court ruled for Litton and held the grievance non-arbitrable. It noted that “[o]nly where [factors such as aptitude and ability] were equal was the employer required to look to seniority.” Id. at 210, 111 S.Ct. 2215. The Court reasoned: “The important point is that factors such as aptitude and ability do not remain constant, but change over time. They cannot be said to vest or accrue or be understood as a form of deferred compensation. ... We cannot infer an intent on the part of the contracting parties to freeze any particular order of layoff or vest any contractual right as of the Agreement’s expiration.” Id. Only after it construed the disputed provision and determined that no rights were vested was the Court able to conclude that the grievance did not arise under the Agreement, and was thus non-arbitrable.
The Union in this case characterizes Litton as inapplicable because this case does not involve an expired CBA, but Litton is not so easily distinguished. Because the Agreement limited the scope of arbitration to matters regarding the agreement or its construction, the Supreme Court in Litton *137 found it necessary to interpret the agreement in order to properly determine the question of arbitrability. The Union here would argue that the Supreme Court had accordingly reached the merits, but because the merits and arbitrability issues were inextricably intertwined in Litton, the Supreme Court found it necessary to refer to the merits in order to determine what the parties had agreed to arbitrate.
We are presented with a similar situation in this case. In the words of the Supreme Court, “we must determine whether the parties agreed to arbitrate this dispute, and we cannot avoid that duty because it requires us to interpret a provision of a bargaining agreement,” even if we trench to some extent upon the merits. Id. at 209, 111 S.Ct. 2215.
We are not the first Court of Appeals to read Litton this way, or to employ an analysis recognizing the entwining of the merits and agreed-upon arbitrability questions. Int’l Brotherhood of Elec. Workers v. GKN Aerospace N. Am., Inc., 431 F.3d 624 (8th Cir.2005), involved a dispute over whether an employee who had been promoted to a supervisory position had a right to return to the bargaining unit. Because the arbitration provision was limited to matters related to the collective bargaining agreement, the Eighth Circuit held that the arbitrability determination required it to interpret various clauses of the agreement. See id. at 629-30. The court understood Litton to mean that “the judicial responsibility to determine arbitrability takes precedence over the general rule to avoid consideration of the merits of a grievance.” Id. at 628.
In Independent Lift Truck Builders Union v. Hyster Co., 2 F.3d 233 (7th Cir.1993), another case limiting arbitration to disputes arising out of a collective bargaining agreement, the Seventh Circuit observed that “a court cannot address the arbitrability question without at the same time addressing the underlying merits of the dispute.” Id. at 236. After discussing Litton, the court concluded: “If the court must, to decide the arbitrability issue, rule on the merits, so be it.” Id. Indeed, both this court and our sister courts had conducted a similar analysis even before Litton. See E.M. Diagnostic, 812 F.2d at 95; United Steelworkers Local No. 1617 v. Gen. Fireproofing Co., 464 F.2d 726, 729 (6th Cir.1972) (“In order to determine then whether the parties have agreed to arbitrate [the matter at issue], we must examine the collective bargaining agreement ... to see if, under any reasonable interpretation, agreement to arbitrate can be found.”); Peerless Pressed Metal Corp. v. Int’l Union of Electrical, Radio and Machine Workers, 451 F.2d 19, 21 (1st Cir.1971) (holding a dispute arbitrable because it arose under a construction of an agreement that, while “weak,” was not “impossible” or “inconceivable”).
Y.
We will affirm the District Court’s judgment dated March 31, 2009, that the parties had not agreed to arbitrate the issue of access to the Eckerd stores and their employees.

. One CBA covers the Northeast Division, which comprises Lehigh, Northampton, Northumberland, Montour (erroneously given as “Monture'' in the CBA), Carbon, Wayne, Monroe, Wyoming, Susquehanna, Luzerne, Columbia, Sullivan, Lycoming, Lackawanna, and Pike counties. The Philadelphia Division agreement covers Rite Aid stores in Philadelphia, Delaware, Bucks, Montgomery, and Chester counties. The Reading Division CBA extends to stores in Schuylkill, Lancaster, Berks and Lebanon counties.
The parties agree that the three CBAs are identical in all respects relevant to this appeal. For the sake of convenience, we will therefore refer to "the CBA” as though there were a single agreement between Rite Aid and the Union.

. The consolidated grievances remain in arbitration pending the outcome of this appeal.

. In earlier cases, we had treated a District Court’s arbitrability decision as a finding of fact with respect to the parties’ intent to arbitrate a particular dispute, and reviewed only for clear error. See Lukens Steel Co. v. United. Steelworkers of Am., 989 F.2d 668, 672 (3d Cir.1993); John F. Harkins Co., Inc. v. Waldinger Corp., 796 F.2d 657, 659-60 (3d Cir.1986). In Rohm and Haas, however, we clarified that this more deferential standard applies only where the relevant documents are ambiguous. See 522 F.3d at 330 n. 7.

. Under Sections 11.1 and 11.2 of the CBA, grievances are first to be filed with the store manager, and if not resolved within two days, next submitted to a Rite Aid Human Resources Manager. If the dispute is not resolved in the following three days, it is presented to Rite Aid’s Director of Labor Relations. If the matter is still unresolved three days after that, the grievance is referred to arbitration. Under Section 11.3.1 (labeled Section 11.3 in the Philadelphia Division CBA), the arbitrator is selected jointly by the parties or, in the event the parties cannot agree, selected pursuant to the rules of the American Arbitration Association.

. We find it rather curious that the Union charges the District Court with reaching the merits of the instant dispute in the course of declaring it non-arbitrable (see infra Part IV), while simultaneously urging us to consider favorable (to the Union) merits decisions as evidence of the dispute's arbitrability. The merits and arbitrability questions are distinct, and a court must limit itself to addressing the latter, regardless of whether the merits appear favorable or unfavorable to an arbitration proponent.

. Another recent case submitted by the Union pursuant to Fed. R.App. P. 28(j), PPG Indus. v. Int’l Chemical Workers Union Council, 587 F.3d 648 (4th Cir.2009), is inapposite. In PPG, the employer sought to vacate an arbitration award involving the interpretation of a term in a bonus plan that had been expressly incorporated into a CBA with a mandatory arbitration clause. Both parties agreed in *134 PPG that the bonus plan was subject to the CBA’s arbitration provisions; the employer merely disagreed with the arbitrator's interpretation of what the employer termed the “plain language” of the plan.
The District Court vacated the arbitration award, but the Fourth Circuit reversed, writing that "[tjhe Company’s argument simply constitute an attack on the correctness of the arbitrator's decision. A court has no warrant to determine the correctness of the arbitrator's award.” Id. at 653. By contrast, in the instant case Rite Aid challenges only whether the Union’s grievance is arbitrable inasmuch as neither Rite Aid nor the Union ever agreed to arbitrate the access issue.

. Rohm & Haas is a recent opinion of this Court. As my dissenting colleague concedes, this Court was required to consider substantive provisions of the collective bargaining agreement to determine whether, as the union argued, " 'disability benefits' are considered 'working conditions’ [under the collective bargaining agreement].” Dissent at n. 18 (emphasis added). This being so, it is obvious that the merits may be considered when necessary to determine arbitrability. The dissent does not take issue with Rohm & Haas, as it cannot, because Rohm & Haas is a precedential opinion of this Court. Indeed, the dissent does not attempt to explain why we should not be bound by this very recent binding precedent. The dissent’s discussion of Rohm & Haas, significant though it is, is confined to a single footnote. We are content to rely upon Rohm & Haas as a precedent in this Circuit.

. We observe as did the District Court that Article 25 of the CBA provided Rite Aid with the right to “open new establishments of any kind.” The Philadelphia Division version of the CBA also contained a Section 2.3, which required Rite Aid to “notify the Union of any new store openings or acquisitions within the five (5) county Philadelphia area.” If the parties had intended a right of access to be encompassed by the CBA’s arbitration clause, it surely would have appeared in the CBA in the context of these provisions. No such provision appears anywhere in the CBA.